**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

APRIL M.A. DODGE          )
      Plaintiff,        )
                   )
v.                    )   Case No.1:09-CV-528-AJT/IDD
                   )
CDW GOVERNMENT, INC.   )
      Defendant.      )
                   )

**PLAINTIFF'S REBUTTAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Comes now April M.A. Dodge, by counsel, and hereby submits the following

Rebuttal Memorandum in Support of Plaintiff's Motion for Summary Judgment pursuant

to Fed. R. Civ. P. 56(c):

**TABLE OF CONTENTS**

**Heading**

**Page**

**TABLE OF CONTENTS**………………………………………….....   i

**ARGUMENT**……………………………………………………….   1

**I. Controlling Standard**......……………………………………….   1

**II. April Dodge Prevails Under the Controlling Legal Standards**......................   1

**A. April Dodge's Claims Remain Distinguishable from Jensen, and the
Related Cases Support Ms. Dodge's Position**.........................................   1

**B. The Statute of Limitations Does Not Bar April Dodge's Claims**...................   4

**II. The Alleged Disputed Material Facts are not Subject to Genuine Disputes**.   5

**A. There is No Genuine Dispute as to items Presented at the July 2004
Meeting**..........................................................................................   5

**B. CDW-G Misinterprets the Circumstances of When an Account Manager is Credited with a Sale**.......................................................................   7

**C. There is no Genuine Issue of Material Fact in Interpreting the Meaning of "Commission Cap."**...............................................................   8

**D. The Reduction of Ms. Dodge's Adjusted Gross Profit for the Blackberry Deal was used to Pay a "Wireless Fee," and She was not Informed of the Reduction**...............................................................................   9

**E. Various "Disputed Facts" are Not Disputed, or have been Mischaracterized**.......................................................................   9

**ARGUMENT**

**I. Controlling Standard**

As has been previously briefed:

Factual disputes must be material: any factual dispute must affect the outcome of

the suit under the governing law to preclude the entry of summary judgment. *Bryant v.*

*Bell Atl. Md., Inc.*, 288 F.3d 124 (4th Cir. 2002).

Factual disputes must also be genuine: summary judgment should be entered if

the evidence is such that a reasonable trier of fact could not find for the nonmoving party.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). To defeat a motion for summary

judgment, the nonmoving party must set forth, by exhibit or affidavit, specific facts

showing that there is a genuine issue for trial. *Burgoon v. Potter*, 369 F. Supp. 2d 789,

794 (E.D. Va. 2005).

**II. April Dodge Prevails Under the Controlling Legal Standards.**

**A. April Dodge's Claims Remain Distinguishable from Jensen, and the Related Cases Support Ms. Dodge's Position.**

April Dodge's claims are sufficiently distinguishable from *Jensen v. IBM Corp.*,

to warrant Summary Judgment in her favor. 454 F.3d 382 (4th Cir. 2006). Further,

CDW-G's references to related cases support Ms. Dodge's positions.

April Dodge's case is distinguishable from *Jensen* in a number of key ways as

discussed in Pl. Mem. Opp. Def. Summ. J. § I.A. pp. 7-10. On a basic level, the July

2004 Powerpoint presentation is a fundamental change as to how Account Managers are

compensated, and as such this document supersedes all previous sales plan documents.

SUMF ¶¶ 15, 42; Pl. Mem. Supp. Mot. Summ. J. Ex. 9; Def. Mem. Supp. Summ. J. ¶¶

18-20; Def. Mem. Opp. Pl. Summ. J. ¶ 10. Just as in *Jensen*, the July 2004 rollout of the

1

new federal compensation plan in this case serves as the basis for the claim for breach of contract. *Jensen*, 454 F.3d at 384. The document relied upon by Jensen was presented in circumstances similar to that of the 2004 Powerpoint presentation in this case. *Id.* Importantly, though, the facts of *Jensen* differ from those before the Court in the following manners:

| Subject | Facts in *Jensen* | Facts in *Dodge v. CDW-G* |
|---|---|---|
| Disclaimer | The primary sales plan document indicates that when the document is in conflict with other sales plan documents, the other sales plan documents prevail. *Jensen*, 454 F.3d at 384. | No such disclaimer. Pl. Mem. Supp. Mot. Summ. J. Ex. 9. |
| Incorporation by reference | The primary sales plan document directed employees to access additional documents applicable to them on the Company intranet. *Jensen*, 454 F.3d at 384. | No such direction. Pl. Mem. Supp. Mot. Summ. J. Ex. 9. The only potential relevant document, the 2001 Rother email, by virtue of being an email sent only to specific recipients, and not a traditional policy document, was not available to April Dodge. |

| Large deal commission alterations | "Field Guide" and "Playbook" available on the company intranet were incorporated by reference, and stated that reduced commissions would be paid for larger deals. *Jensen*, 454 F.3d at 385. | Megadeal policy not incorporated by reference in any sales plan document distributed to Account Managers other than a 2001 email that was not distributed to new Account Managers after the email was sent.  SUMF ¶¶ 38-40, 47-49, 57, 60. |
|---|---|---|
| Employer's right to modify | Employer reserved the right to adjust, cancel or modify terms of the compensation plan up until the time payment was made. *Jensen*, 454 F.3d at 385. | No such language.  Pl. Mem. Supp. Mot. Summ. J. Ex. 9. |
| Vesting language | "[N]o one becomes entitled to any payment in advance of his or her receipt of the payment. *Jensen*, 454 F.3d at 385. | No such language.  Pl. Mem. Supp. Mot. Summ. J. Ex. 9. |
| Intent to be bound | "This program does not constitute a promise by IBM to make distributions under it." *Jensen*, 454 F.3d at 385. | No such language.  Pl. Mem. Supp. Mot. Summ. J. Ex. 9. |

The timing and nature of what constitutes a sale are discussed in Pl .Mem. Supp. Summ. J. §§ II A.2. pp. 17-18, II.E. p. 24.  Further, the Court in *Jensen* specifically states that "[i]t is true that in the absence of vesting language, a commission might be earned when the sale is made."  *Jensen,* 454 F.3d at 389.  There is no vesting language in the Powerpoint presentation.  Pl. Mem. Supp. Mot. Summ. J. Ex. 9.

Given the dissimilarities in facts between the instant case and *Jensen* none of CDW-G's analyses of the cases cited in *Jensen* or the real estate cases alter the analysis as stated in Pl .Mem. Supp. Summ. J. § II.A. pp. 14-20 and Pl. Mem. Opp. Def. Summ. J. I.A. pp. 5-15 and I.C. pp. 18-21.

**B. The Statute of Limitations Does Not Bar April Dodge's Claims.**

The Powerpoint presentation of July 2004 constitutes a written offer of Unilateral Contract.  Pl. Mem. Supp. Mot. Summ. J. Ex. 9.  CDW-G suggests that since the July 2004 Powerpoint presentation was not actually handed out to Account Managers at the meeting, that it does not constitute a written offer.  Def. Mem. Opp. Pl. Summ. J. p. 11-12.  On a basic level, the Powerpoint presentation is written down and was formally presented.  Additionally, the Powerpoint presentation was not withheld from CDW-G sales staff, and in fact when April Dodge requested a copy of the new commission matrix as stated in the July 2004 Powerpoint presentation in August 2004, a supervisor in her office at the time, Brian Burns, immediately provided her a copy.  Ex. 1 ¶ 8; Ex. 2.  Finally, in spring 2005 when April Dodge went to human resources to discuss her commission for the Monitor Agreement, human resources staff freely gave her a copy of the July 2004 Powerpoint presentation.  The July 2004 Powerpoint presentation was written down and made available to Account Managers, and therefore constitutes a

4

written document for purposes of calculating the statute of limitations.  Pl. Mem Supp.

Mot. Summ. J. Ex. 9.

**II. The Alleged Disputed Material Facts are not Subject to Genuine Disputes.**

    **A. There is No Genuine Dispute as to items Presented at the July 2004 Meeting.**

    As stated in Pl. Mem. Supp. Summ. J. SUMF ¶¶ 42-47 at the July 2004 sales

meeting a Megadeal policy was simply mentioned as a potential future policy.  No details

about the nature of a Megadeal policy were presented or discussed.  SUMF ¶¶ 42-47.

CDW-G suggests that something more than a mere mention of a Megadeal policy

occurred, and that that mention referred to a current Megadeal policy, and not a proposed

future policy.  Def. Mem. Opp. Pl. Mot. Summ. J. ¶¶ 1, 8, 10-13, 15-16, 19.  The record

indicates a Megadeal policy was discussed exactly as April Dodge suggests.

    CDW-G's statements in discovery support SUMF ¶¶ 42-47.  CDW-G, in response

to interrogatories, states simply that Ms. Dodge was informed of the Megadeal Policy in

the July 2004 meeting.  Pl. Mem. Supp. Mot. Summ. J. Ex. 10 No. 6.  No details about

the nature or substance of the Megadeal policy are suggested.  Further, CDW-G, when

called for a corporate deposition pursuant to Fed. R. Civ. P. 30(b)(6), when asked what

was told to April Dodge about the Megadeal rule at the July 2004 presentation stated

"The best I can recall was that the mega deal [sic] rule was briefly discussed and was

communicated to the federal sales team, that it would be a part of a document which was

being prepared for the coworkers."  Rossi Depo. p. 71 line 9 - p. 72 line 21, Ex. 3.  This

statement is both consistent with April Dodge's claim in her facts that the Megadeal rule

was only briefly mentioned, and that it was discussed in light of a future rather than

current policy.

Written communications regarding the July 2004 meeting support SUMF ¶¶ 42-47. The Powerpoint presentation makes only one reference to a Megadeal policy. Pl. Mem. Supp. Mot. Summ. J. Ex. 9. The term "Megadeal" appears only once in the document on page nine. Pl. Mem Supp. Mot. Summ. J. Ex. 9. In this one reference it is to a future policy document, and not to an existing policy. Pl. Mem. Supp. Mot. Summ. J. Ex. 9. Ultimately this new or future policy document was never distributed. SUMF ¶ 49. Additionally, this same future document was referenced in one of Robert Rossi's emails of December 29, 2004, indicating it was "still under legal review." Pl. Mem Supp. Mot. Summ. J. Ex. 15. Finally, Ex. A ¶ 12 to Def. Mem. Opp. Mot Summ. J. is a federal compensation guideline document that was intended for distribution as claimed by CDW-G, but was never distributed. This document looks extremely similar to the federal sales guidelines policies and procedures document from 2003 that CDW-G uses to support much of the substantive aspects of its Mem. Supp. Summ. J[1]. One of the distinguishing features of this document is the *first and only* inclusion of a description of a Megadeal rule in a document slated to be provided to Account Managers other than the 2001 Rother email. Had a Megadeal rule been in effect in 2003 it would have been included in the "2003 Sales Guidelines Policies and Procedures" document. Ex. 4. The fact that the first policy document detailing a Megadeal rule was developed at the time of the July 2004 presentation supports the conclusion that a Megadeal rule was to be communicated in a formal policy document for the first time at the end of July as indicated on page 9 of the July 2004 Powerpoint presentation. Pl. Mem Supp. Mot. Summ. J. Ex. 9. All three of

---

[1] Only a portion of this document is attached to Def. Mem. Supp. Summ. J. A complete copy of this document is attached for the Court to compare the new compensation plan with the old compensation plan. Ex. 4.

these documents support the fact that the Megadeal policy was only discussed as it related to a proposed future policy.

Finally, other account managers agree with April Dodge's recitation of events remembering no explanation of a Megadeal policy in the July 2004 meeting or otherwise. Ex. 6, ¶¶ 6-7.

The documentation and admissions in this case all support April Dodge's characterization of the meeting in July 2004. Further, April Dodge is clear about what was and what was not discussed. CDW-G provides nothing but vague statements. In reality there is no genuine dispute of material fact as to what was discussed at the July 2004 meeting, and Summary Judgment in favor of April Dodge should be granted.

**B. CDW-G Misinterprets the Circumstances of When an Account Manager is Credited with a Sale.**

An Account Manager is credited with a sale at the time the sale is made. There are various provisions that allow the credit for a sale to be shifted away from the Account Manager, as suggested by CDW-G, but this does not change the fact that the Account Manager earned and was credited with a sale in the first place. Def. Mem. Opp. Pl. Mot. Summ. J. ¶¶ 3, 4, 5. In recognition of the unfairness of the general practice of shifting credit away from an Account Manager that secured a sale, but then was moved to a new sales territory, CDW-G routinely allows Account Managers to keep their commissions for larger sales secured under the previous sales territory, even if the products have not yet shipped or commission been calculated when they are moved to the new sales territory. Ex. 1 ¶ 4. CDW-G is attempting to suggest that securing a contract for sale is almost a non-event as no purpose is served unless goods actually ship pursuant to the purchase order. This ignores the fact that for an Account Manager, nearly all the work in

earning the business to ensure that goods ship to a customer occurs at or before the time of signing of the purchase order.  Ex. 1 ¶ 5.

### C. There is no Genuine Issue of Material Fact in Interpreting the Meaning of "Commission Cap."

The overwhelming weight of evidence supports the concept that the Megadeal policy is considered a commission cap by CDW-G.  CDW-G through its Fed. R. Civ. P. 30(b)(6) designee, Robert Rossi, and by affidavit, is claiming for litigation purposes that the Megadeal policy does not constitute a commission cap.  This is important as James Shanks, Vice President of CDW-G claimed that there is no commission cap.  SUMF ¶ 65.  Nonetheless, those most affected by commission caps, as well as managers responsible for policies such as the Megadeal policy, believed the Megadeal policy clearly constituted a commission cap as interpreted by CDW-G culture.  April Dodge, an Account Manager and Plaintiff in this matter, understood that under CDW-G culture a commission cap is a limit to the percentage of adjusted gross profit one could receive as commission for a particular deal.  Ex. 1 ¶ 2.  Similarly, William Dolan a former Account Manager, understood that under CDW-G culture a commission cap is a limit to the percentage of adjusted gross profit one could receive as commission for a particular deal.  Ex. 6 ¶¶ 3-4.  Most importantly, Robert Green, Director of Civilian Sales at CDW-G[2], understood that under CDW-G culture a commission cap is a limit to the percentage of adjusted gross profit one could receive as commission for a particular deal.  Ex. 5 ¶¶ 9-10.  The weight of evidence, even from a former Director at CDW-G suggest that there is no issue of material fact as to the definition of "commission cap," and that CDW-G's position on this issue has been carefully developed for trial.

---

[2] Director of Civilian Sales is the same level of manager at which Robert Rossi was serving in 2004 and 2005.  Ex. 1 ¶ 3.

It is not necessary for April Dodge to show that the definition of commission cap includes a limit on the percentage of adjusted gross profit an Account Manager may receive to win her Motion for Summary Judgment.  Nonetheless, if April Dodge proves this particular point, based on CDW-G's admission by James Shanks And supported by Robert Green's Affidavit), the Court may determine that there was no actual Megadeal policy, that April Dodge's commissions for the Monitor Agreement were artificially and arbitrarily reduced, and that April Dodge was owed 19% commission for the months of April, May, and June 2005.  Ex. 5 ¶¶ 4-7, 11.

**D. The Reduction of Ms. Dodge's Adjusted Gross Profit for the Blackberry Deal was used to Pay a "Wireless Fee," and She was not Informed of the Reduction.**

CDW-G by its documents and statements insinuates that the $60,000 reduction to gross profit applied to April Dodge on the Blackberry Agreement was somehow shifted to the Wireless Specialist.  Def. Mem. Opp. Pl. Mot. Summ. J. ¶ 6.  Contrary to this claim, in CDW-G's corporate deposition, CDW-G states this money was reduced from April Dodge's Adjusted Gross Profit to pay a "wireless fee."  SUMF ¶¶ 27-28.  Further, April Dodge was not informed of what was actually done to her commissions for the Blackberry Agreement.  SUMF ¶¶ 28-29; Ex. 1 ¶ 7.  This is further supported by a review of Robert Rossi's notes from his December conversation with April Dodge which contain no mention of this explanation[3].  Pl. Mem. Supp. Mot. Summ. J. Ex. 16.

**E. Various "Disputed Facts" are Not Disputed, or have been Mischaracterized.**

Disputed fact one suggests that Ms. Dodge was informed of the Megadeal policy in December 2004 in a telephone conversation with Todd Favakeh.  Further there are

---

[3] Mr. Rossi's notes on the December 2004 conversation with Ms. Dodge are written in bold, in the third person approximately two thirds of the way down the first page of the exhibit.

references to April Dodge being "informed of the Megadeal policy" in emails on

December 29, 2004 and March 28, 2005.  During the conversation between April Dodge

and Todd Favakeh in December 2004, Mr. Favakeh did not reference the term

"Megadeal," but did indicate that Ms. Dodge's commission for the Blackberry

Agreement would be reduced.  Exhibit 1 ¶ 1.  CDW-G has provided no evidence to

support a claim otherwise.  The December 29, 2004 email did not inform Ms. Dodge of

the Megadeal policy except to the extent there is a reference to imposition of a Megadeal

policy in a proposed sales plan document.  Pl. Mem. Supp. Mot. Summ. J. Ex. 15.  The

March 28, 2005 email chain between April Dodge and Robert Rossi provides no

information informing April Dodge of a Megadeal policy as suggested by Defendant.

Def. Mem. Supp. Summ. J., Roche Dec. Ex. 9.  The content of neither email rises to the

level of "informing" Ms. Dodge of the Megadeal policy or that it was being applied to the

Monitor Agreement.

Disputed fact seventeen suggests that the 2001 email given to April Dodge on or

about April 12, 2005, is a copy of the Megadeal policy.  Pl. Mem. Supp. Summ. J. Ex. 17.

The email in question at best for CDW-G explained the Megadeal policy as it existed in

2001.  Pl. Mem. Supp. Summ. J. Ex. 17.  CDW-G indicates that the contents of this

document did not constitute the complete Megadeal policy as of 2003.  Def. Mem. Supp.

Summ. J. § II ¶ 25.  This email was never reissued to sales staff.  SUMF ¶ 39.  As such,

the email did not reflect the then current formal documentation of the Megadeal policy as

stated in SUMF ¶ 60, the alleged disputed fact.  The July 2004 Powerpoint presentation

was presented at an all sales staff meeting by the Vice President of Federal Sales.  The

Powerpoint presentation was important enough to call all Account Managers to one

location at the same time and for presentation by an executive.  The 2001 email, distributed before April Dodge's employment, and never reiterated lacks the distinct formalities of the July 2004 Powerpoint presentation.

There is a suggestion in paragraph 5 that Ms. Dodge did not secure the sale for Blackberrys.  This is false for two reasons.  First, April Dodge's managers, Todd Favakeh and Robert Rossi worked from the Chicago offices of CDW-G and had little or no knowledge of the existence of the Blackberry Agreement or Monitor Agreements until at or just before the Purchase Orders were awarded to April Dodge.  Ex. 1 ¶ 9.  Second, the division of labor between April Dodge and the Wireless Specialist, Charles Kriete, was the direct result of the differing roles played by an Account Manager and a Wireless Specialist.  Ex. 1 ¶ 10.  For the Blackberry Agreement, the Account Manager and the Wireless Specialist each had distinct roles to play with few overlapping responsibilities.  Ex. 1 ¶ 11.  The percentages of division of labor as stated by April Dodge for the Blackberry deal were a function of roles and not in any manner due to lack of effort.  Ex. 1 ¶ 12.

Any changes to the Megadeal policy in 2003 were not communicated to Account Managers or to all of management, unlike as suggested in paragraph 9.  Ex. 1 ¶ 6; Ex. 5 ¶¶ 4-7; Ex. 6 ¶ 7.

Disputed fact number two references a date in Plaintiff's SUMF ¶ 16.  The year was in fact a typographical error and should have been 2004.

WHEREFORE, Plaintiff, April M.A. Dodge asks this honorable Court to grant Summary Judgment in favor of the Plaintiff in accordance with Plaintiff's Cross Motion for Summary Judgment and deny Summary Judgment to Defendant.

Respectfully Submitted,
April M.A. Dodge
By Counsel

_____/s/_____
Paul A. Prados
Virginia State Bar No. 71374
*Attorney for April M.A. Dodge*
Cuccinelli & Day, PLLC
10560 Main St., Ste. 218
Fairfax, VA 22030
Phone: 703.268.5600
Facsimile: 703.268.5602
pprados@cuccinelliday.com

### Certificate of Service

I hereby certify that on this 20 day of November, 2009, I will electronically file

the foregoing with the Clerk of Court using the Court's CM/ECF system, which will then

send a notification of such filing (NEF) to the following:

John K. Roche
Virginia State Bar No. 68594
Attorney for CDW Government, Inc.
Perkins Coie, LLP
607 Fourteenth Street N.W., Suite 800
Washington D.C. 20005-2003
Phone: 202-434-1627
Facsimile: 202-654-9106
JRoche@perkinscoie.com

BY:_____/s/_____
Paul A. Prados
Virginia State Bar No. 71374
*Attorney for April M.A. Dodge*
Cuccinelli & Day, PLLC
10560 Main St., Ste. 218
Fairfax, VA 22030
Phone: 703.268.5600
Facsimile: 703.268.5602
pprados@cuccinelliday.com