# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | | |
|---|---|---|
| APRIL M. DODGE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-528-AJT/IDD |
| v. | ) | |
| | ) | **REDACTED VERSION** |
| CDW GOVERNMENT, INC., | ) | **(Motion to Seal Noticed for Hearing on** |
| | ) | **December 4, 2009 @ 10:00 a.m.)** |
| Defendant. | ) | |
| | ) | |

## DEFENDANT CDW GOVERNMENT, INC.'S
## REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant CDW Government, Inc. ("CDW-G") hereby submits its reply in support of its

Motion for Summary Judgment against Plaintiff April M. Dodge ("Ms. Dodge") on both counts

of Ms. Dodge's Complaint for breach of an alleged employment contract.

## I.    ARGUMENT

### A.    Ms. Dodge Has Not Identified Any Genuine Issue of Material Fact in Her Opposition Brief That Precludes the Court from Ruling in CDW-G's Favor

"In determining a motion for summary judgment, the Court may assume that facts

identified by the moving party in its listing of material facts are admitted, unless such a fact is

controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va.

Local Civ. R. 56(B). "The Fourth Circuit has held that a party cannot create a genuine issue of

material fact simply by making an assertion that contradicts earlier deposition testimony." *Smith*

*v. Estes Exp.*, No. 3:08cv574, 2009 WL 1009956, at *9 (E.D. Va. Apr. 14, 2009) (*citing*

*Hernandez c. Trawler Miss Verties Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999)).[1]  Furthermore,

---

[1] *See also Alfa Laval, Inc. v. Nichols*, No. 3:06CV306, 2007 WL 984111, at *7 (E.D. Va. Mar. 29, 2007) (finding "no credible evidence that presents a *genuine* issue of disputed material fact sufficient to overcome summary judgment" where a party submitted nothing "other than a self-serving affidavit which contradicts in significant part his earlier deposition testimony.") (emphasis in original).

conclusory statements in an affidavit are similarly insufficient to prevail on summary judgment. *Rohrbough v. Wyeth Labs, Inc.,* 916 F.2d 970, 975 (4th Cir. 1990) (disregarding affidavit that was "nearly entirely conclusory and devoid of specific facts to support [the witness'] opinion").

In her Opposition, Ms. Dodge takes issue with only thirteen of the sixty Statements of Undisputed Material Fact ("SUMF") listed in CDW-G's motion, thus consenting to the remaining forty-seven statements. Where Ms. Dodge has attempted to create an issue of material fact, she has done so with a facially deficient affidavit that consists of either (1) conclusory statements devoid of any factual support (*see* paragraphs 2-4 of Ms. Dodge's affidavit), or (2) claims that flatly contradict her sworn deposition testimony (*see* paragraphs 4, 10-13 and 15 of Ms. Dodge's affidavit). Accordingly, as described in further detail below, Ms. Dodge has failed to identify any genuine issue of material fact, and the Court should grant summary judgment in CDW-G's favor. Furthermore, given her numerous attempts to use her affidavit to contradict her own deposition testimony, the Court should disregard Ms. Dodge's affidavit altogether. *Rohrbough,* 916 F.2d at 975.

### 1.    Paragraph 8 of CDW-G's SUMF

Paragraph 8 describes CDW-G's policy, as stated in its "2003 CDW Sales Guidelines and Procedures," that commissions are ███████████████████████████████████████████████████ ████████████[2] It further states the obvious fact that gross profit on a sale cannot be calculated until after the products involved have been shipped and invoiced, thus establishing that ███████████████████████████████████████████████████ ███████████████[3] Ms. Dodge attempts to contest these facts with conclusory statements in her affidavit that suggest this policy only addresses when commissions are

---

[2] *See* CDW-G's SUMF, ¶ 8 (Docket No. 25) (emphasis added).
[3] *Id.*

calculated, not earned.[4] Thus, Ms. Dodge asks the Court to ignore half of the phrase "calculated and earned" in CDW-G's policy. However, Ms. Dodge's conclusory statements asking the Court to simply ignore evidence that hurts her case are plainly not sufficient to create a genuine issue of material fact. *Rohrbough*, 916 F.2d at 975.

No doubt realizing that the Court cannot simply ignore parts of CDW-G's policies, Ms. Dodge's back-up argument is that the policy described in paragraph 8 is actually not "applicable to the commissions at issue in this matter, as the document applied to commission schemes is [sic] in an entirely different department, with different calculations."[5] This statement is problematic for a host of reasons. First, Ms. Dodge has stipulated that commissions are earned in the month when the goods involved in a sale are shipped and invoiced.[6] Second, Ms. Dodge cites nothing in the record to show that the "2003 CDW Sales Guidelines and Procedures" did not apply to commissions for all account managers, regardless of what department they were in. The reason she fails to cite anything in the record is because page two of the document clearly states, without limitation, that "[t]his handbook is furnished to you for the purpose of describing some of the policies and procedures that apply to CDW Account Managers."[7] And finally, Ms. Dodge does not contest paragraph 54 of CDW-G's SUMF, which affirms her sworn testimony that the "2003 CDW Sales Guidelines and Procedures" applies to her alleged contract with

---

[4] *See* Ms. Dodge's Opposition to Defendant's Motion for Summary Judgment, at 1-2 (Docket No. 33).
[5] *Id.*
[6] *See* Stipulated Facts, ¶ 8 (Docket No. 23) ("At the time that goods ship to the customer, an invoice is generated and sent to the customer."); *id.* at ¶ 9 ("When the invoice is sent to the customer, the account is credited with the sale, and commission will be paid for the month in which the account is credited"); *id.* at ¶ 10 ("Commissions are paid the following month (e.g., commissions earned in May are paid in June") (emphasis added); *id.* at ¶ 11 ("The commissions are calculated based on the month in which the goods are shipped, and not when the Purchase Order is signed."). These stipulated facts are restated in paragraphs 12-15 of CDW-G's SUMF, which Ms. Dodge has not contested in her Opposition.
[7] *See* Exhibit 4 to Roche Dec., at 2 (Docket No. 25-2).

CDW-G.[8] This is critical because Ms. Dodge claims the only "contract" at issue is an alleged unilateral offer "regarding commissions."[9] It is thus totally disingenuous, not to mention illogical, for her to have testified in her deposition that the "2003 CDW Sales Guidelines and Procedures" contains some of the terms of her alleged contract, while now claiming in her affidavit that the section of that document specifically addressing commissions is not among those terms. Accordingly, CDW-G respectfully submits that Ms. Dodge has failed to raise any genuine issue of material fact with regard to paragraph 8 of CDW-G's SUMF.

### 2. Paragraph 9 of CDW-G's SUMF

In paragraph 9, CDW-G simply quotes language from page four of the "2003 CDW Sales Guidelines and Procedures." As with paragraph 8, Ms. Dodge contests these facts by asking the Court to ignore the word "earned" as it appears on page four of the "2003 CDW Sales Guidelines and Procedures" and to accept her affidavit as proof that this document has no relevance to her alleged contract. Because Ms. Dodge's affidavit flatly contradicts her sworn deposition testimony as described above, she has similarly failed to raise a genuine issue of material fact as to paragraph 9.

### 3. Paragraph 37 of CDW-G's SUMF

Ms. Dodge uses her affidavit to contest the statement contained in paragraph 37 that Robert Rossi, Director, Federal Inside Sales, told her on December 13, 2004, "that the Megadeal policy was in effect at CDW-G." This denial flatly contradicts her sworn deposition testimony:

---

[8] See CDW-G's SUMF, ¶ 54 (Docket No. 25).
[9] See Ms. Dodge's Opposition to Defendant's Motion for Summary Judgment, at 14 (Docket No. 33) (emphasis added).

Q: And Mr. Rossi also orally presented to you on December 13th the fact that the mega deal rule was <u>in effect and being applied by the company</u>?

A: Yes. That is what he said.[10]

Once again, Ms. Dodge's troubling attempt to back away from her sworn deposition testimony is not a proper means of creating a genuine issue of material fact on summary judgment.

### 4.     Paragraph 38 of CDW-G's SUMF

Ms. Dodge admits in her response to paragraph 38 that as of December 29, 2004, she understood the terms of the Megadeal policy well enough to know that the Monitor Order satisfied the criteria for application of the Megadeal policy, thus negating any claim that the Megadeal policy was not adequately explained to her. Additionally, her averment that "Mr. Rossi indicated to Ms. Dodge that a Megadeal policy would not be coming out until the 2005 sales plan document was issued" is flatly contradicted by the testimony reproduced above which shows that Mr. Rossi in fact told her on December 13, 2004 that the Megadeal policy was already in effect and being applied by CDW-G.[11]

### 5.     Paragraph 39 of CDW-G's SUMF

In response to paragraph 39, Ms. Dodge denies that as of March 28, 2005, she "clearly understood that CDW-G would apply the Megadeal policy to limit her commission to 10% of the adjusted gross profit on the Monitor Order." This denial is another disturbing attempt by Ms. Dodge to use her affidavit to contradict <u>three</u> separate pieces of evidence. First, Ms. Dodge has stipulated that "[n]o later than March 28, 2005, [she] was informed by Robert Rossi that the Megadeal policy was being applied to limit her commission to 10% of the adjusted gross profit

---

[10] *See* Dodge Depo. at 65:21 – 66:2 (attached as Exhibit 2 to Roche Dec.) (Docket No. 25-2) (emphasis added).
[11] *Id.*

on the Monitor Agreement."[12] Second, on March 28, 2005, Robert Rossi sent Ms. Dodge an email that states in pertinent part,

> There is no change to the way you were getting paid on this deal. Per our conversation a few months back I confirmed with you the plan that covers deals over 2.5M where AMs are eligible to receive up to 10% of the Net Gross Profit. This holds true when there is significant involvement from management to close the business and work logistics. Do you recall this conversation we have [sic] in the Herndon office?[13]

Finally, Ms. Dodge testified as follows in her deposition:

> Q: Okay. And in this email he makes clear that you're going to be paid 10 percent of the net gross profit on the monitor deal; is that correct?
>
> A: That's correct.
>
> Q: And that was under the mega deal rule?
>
> A: That's correct.
>
> Q: And this was what you understood he had been communicating to you back in the December 13th meeting as well, correct?
>
> A: Yes. Then I realized it.
>
> Q: This e-mail string is March 23rd through 28th 2005. Is that correct?
>
> A: Yes.[14]

Ms. Dodge further avers in response to paragraph 39 that she "did not know with certainty that CDW-G would be reducing her commissions for the Monitor Agreement until the first paycheck was issued on May 20, 2005." Yet again, this denial does not square with Ms. Dodge's sworn testimony:

> Q: So is it fair to say that as of April 12th 2005 you realized that CDWG was not going to pay you 19 percent commission on the monitor deal?
>
> A: That's likely correct.

---

[12] *See* Stipulated Facts, ¶ 24 (Docket No. 23) (attached as Exhibit 1 to Roche Dec.) (Docket No. 25-2).
[13] *See* Exhibit 9 to the Roche Dec. (Docket No. 25-2).
[14] *See* Dodge Depo. at 69:15 – 70:5 (attached as Exhibit 2 to Roche Dec.) (Docket No. 25-2) (emphasis added).

Q: Okay. Well, is it correct?

A: Yes. That is.[15]

Accordingly, because there is simply no tangible evidentiary support for Ms. Dodge's attempt to contest the facts stated in paragraph 39, CDW-G asks the Court to give no weight to her denials. Indeed, given her numerous attempts to use her affidavit to contradict her own deposition testimony, the Court should disregard Ms. Dodge's affidavit altogether. *Rohrbough,* 916 F.2d at 975.

**6.      Paragraph 42 of CDW-G's SUMF**

Rather than engage in a semantic debate over the veracity of Ms. Dodge's denial of paragraph 42, CDW-G will allow the testimony cited in support of paragraph 42 to speak for itself:

Q: So is it fair to say that as of April 12th 2005 you realized that CDWG was not going to pay you 19 percent commission on the monitor deal?

A: That's likely correct.

Q: Okay. Well, is it correct?

A: Yes. That is.

Q: And so far as you were concerned they completely and totally abandoned their alleged contractual commitment to pay you 19 percent commission on the monitor deal?

A: Yes. I believe they were going to breach that.

Q: You understood that as of April 12th 2005?

A: That's correct.

---

[15] *See* Dodge Depo. at 75:19 – 76:2 (attached as Exhibit 2 to Roche Dec.) (Docket No. 25-2).

Q: And so this email is the point at which you accepted the fact that trying to work things out through coworkers [sic] services and Bob Rossi simply was not going to happen?

A: Yes. I knew that I was not going to be able to work with CDW to pay me properly.

Q: To pay you the 19 percent commission you felt you were owed?

A: Exactly.[16]

Based on this testimony, CDW-G respectfully submits that Ms. Dodge's denials of the facts averred in paragraph 42 are as lacking in support as her denials of paragraphs 8, 9 and 37-39.

7.     **Paragraphs 11, 16, 22, 23, 25, 26 and 30 of CDW-G's SUMF**

As previously noted, the Court should disregard Ms. Dodge's unreliable affidavit altogether. However, if the Court accepts Ms. Dodge's affidavit, CDW-G concedes that Ms. Dodge has raised some issues of fact with regard to paragraph 11 that, unlike the paragraphs described above, CDW-G cannot at this time demonstrate to be disingenuous. Even so, these disputed issues of fact do not affect the Court's ability to grant summary judgment on Count II based upon any of CDW-G's arguments. These disputed issues of fact also do not affect the Court's ability to grant summary judgment on Count I based upon the arguments raised in Sections III.B (no enforceable contract) and III.C.1 (statute of limitations) of CDW-G's motion. The disputed issues of fact Ms. Dodge raises about paragraph 11 only potentially impact the arguments raised in Section III.D.1 of CDW-G's motion. As for her response to paragraph 30, Ms. Dodge does not deny any of the facts in paragraph 30, but instead adds some additional immaterial facts. Similarly, the disputed issues raised by Ms. Dodge as to paragraphs 16, 22, 23,

---

[16] *See* Dodge Depo. at 75:19 – 76:19 (attached as Exhibit 2 to Roche Dec.) (Docket No. 25-2) (emphasis added).

25, and 26 are of no consequence to the Court's disposition of CDW-G's motion, as those paragraphs are material only insofar as they provide useful background.[17]

## B. CDW-G is Entitled to Summary Judgment on Both Counts of Ms. Dodge's Complaint Because No Enforceable Contract Existed Between Ms. Dodge and CDW-G

In her effort to convince the Court that she had an enforceable contract with CDW-G, Ms. Dodge relies on two arguments. First, she argues that this case is fundamentally different from *Jensen v. International Business Machines Corp.*, and, second, that a July 2004 PowerPoint that was used in an oral presentation and not distributed to CDW-G's Federal sales staff constitutes an enforceable written contract. For the reasons stated below, neither argument carries the day.

### 1. Ms. Dodge Misconstrues *Jensen*

On page nine of her brief, Ms. Dodge tries to differentiate this case from *Jensen* by claiming that "[u]nlike IBM, CDW-G argues that there was *no contract at all* regarding the commissions...." This is fundamentally wrong, as evidenced by the Court's holding:

> On IBM's motion, [Judge Brinkema] entered summary judgment in favor of IBM, holding that IBM and Jensen <u>had never entered into a binding contract</u> because there had never been a meeting of the minds as to the shape, extent, and firmness of the commission arrangement. This appeal followed.

*Jensen*, 454 F.3d at 386 (emphasis added).

The Fourth Circuit upheld Judge Brinkema's ruling, stating "[w]e agree with the district court that the documents describing IBM's Sales Incentive Plan did not constitute an offer which [plaintiff] could accept to form a binding contract." *Id.* at 388. As noted in Section III.B of

---

[17] Nevertheless, CDW-G does not concede that Ms. Dodge's responses to paragraphs 11, 16, 22, 23, 25, 26 and 30 of CDW-G's SUMF have any merit, only that they are immaterial to the Court's resolution of CDW-G's motion, with the exception of her response to paragraph 11.

CDW-G's Motion for Summary Judgment, the documents that Ms. Dodge cites as containing the terms of her alleged contract contain language that is at least as forceful as the language used by IBM in *Jensen* "to preclude the formation of a contract." *Id*. Ms. Dodge does not contest paragraphs 53-59 of CDW-G's SUMF, which affirm her testimony that these documents contain the terms of her alleged contract.[18] Rather, now that she realizes these documents are fatal to her claim, she reverses course and argues that the only document that is actually relevant to her breach of contract claims is a July 2004 PowerPoint presentation. As described below, this argument is also unavailing.[19]

### 2.    The July 2004 PowerPoint is Not a Contract

In July 2004, CDW-G introduced a revised compensation plan to all Federal account managers[20] via an orally presented PowerPoint that was not distributed to the account managers.[21] Ms. Dodge makes much of the fact that this PowerPoint, which was orally presented and never even distributed, does not contain "language indicating the document does not constitute a contract or may be amended at any time."[22] However, this argument has been rejected by this Court on summary judgment when other plaintiffs have attempted to avoid clear

---

[18] As noted above, Ms. Dodge unconvincingly attempts to contest the relevance of the "2003 CDW Sales Guidelines and Procedures" by disputing paragraphs 8-9 of CDW-G's SUMF, but she does not contest paragraph 54, which affirms her testimony that the "2003 CDW Sales Guidelines and Procedures" contains some of the terms of her alleged employment contract.

[19] On page nine of her opposition, Ms. Dodge also tries to distinguish this case from *Jensen* by noting that IBM placed its 200% Rule (i.e., IBM's analogue to CDW-G's Megadeal policy) on its corporate intranet. She overlooks the fact that the panel's discussion of this fact appeared in Section III of its opinion, in which the court assumed for the sake of argument that an enforceable contract existed. *Jensen*, 454 F.3d at 388. Thus, this fact was irrelevant to the panel's determination that no contract existed. Furthermore, the panel ultimately concluded that IBM would have been within its rights to announce the 200% Rule after the plaintiff made the sale, thus negating any importance one may ascribe to the presence of the policy on IBM's corporate intranet before the sale was made. *Id*. at 389.

[20] *See* CDW-G's SUMF, ¶ 18 (Docket No. 25).

[21] *See* Dodge Depo. at 30:3 – 31:2 (attached as Exhibit 2 to Roche Dec.) (Docket No. 25-2). Ms. Dodge was given a copy of the PowerPoint sometime between December 2004 and May 2005 during her discussions with CDW-G's human resources department about her compensation on the Monitor Order. *See* Dodge Depo. at 25:12 – 26:22 (attached as Exhibit 1 to Supplemental Declaration of John K. Roche).

[22] *See* Ms. Dodge's Opposition to Defendant's Motion for Summary Judgment, at 10 (Docket No. 33).

statements in employment policies by pointing to outside documents that did not contain specific disclaimers. For example, in *Michael v. Sentara Health System*, two nurses brought an action against their employer alleging they were unlawfully terminated. 939 F. Supp. 1220 (E.D. Va. 1996). The defendant had an employee handbook and other documents which "included specific disclaimers" and both plaintiffs signed acknowledgment forms affirming "that the Handbook did not confer contractual rights or alter the at-will presumption." *Id.* at 1236. Nevertheless, the plaintiffs claimed that the disclaimers in the Handbook did not apply to their employer's representations "made outside of the Handbook, such as its oral statements that it would not discriminate in employment, and the statements in [the employer]'s policies and procedures not included in the Handbook." *Id.* In rejecting this argument, this Court relied on the fact that "[t]he Handbook clearly states: 'Although policies, procedures and benefits are provided by the organization, they are not meant as terms or conditions of employment, or guarantees.'" *Id.*

Likewise, in this case CDW-G made it quite clear that (1) all of its policies may be amended at any time, and (2) the policies described in the July 2004 PowerPoint and orally presented to sales staff could not create an enforceable contract. For example, the "2003 CDW Sales Guidelines and Procedures" handbook states, "[a]s with <u>all CDW policies</u>, the policies and procedures described in this handbook are subject to change at any time, with or without notice."[23] When a party reserves the right to change its policies at any time, there is no enforceable contract. *Jensen,* 454 F.3d at 388; *see also Brown v. Rector and Visitors of University of Virginia*, No. 3:07cv00030, 2008 WL 1943956, at *6 (W.D. Va. May 2, 2008). Additionally, this document goes on to state that "[n]o CDW employee <u>other than the President of the Company</u> is authorized to make any representations, promises or agreements concerning

---

[23] *See* Exhibit 4 to Roche Dec., at 2 (Docket No. 25-2) (emphasis added).

an employee's term of employment, <u>compensation</u> or benefits and, to be enforceable, any such representation, promise or agreement must be in writing and <u>signed by the President</u>."[24]  Like the Plaintiffs in *Sentara Health System*, Ms. Dodge's effort to ascribe contractual status to this orally presented and undistributed PowerPoint in contravention of CDW-G's clearly stated policies is unconvincing.

Furthermore, in order for a contract to be enforceable, it must contain all material terms. *Smith v. Farrell*, 199 Va. 121, 128 (1957) ("An incomplete contract, therefore, is one from which one or more material terms have been entirely omitted.").  Such terms include things like payment terms and duration of the contract.  17A Am. Jur. 2d Contracts § 190.  Ms. Dodge herself concedes that "a writing must 'show on its face a complete and concluded agreement between the parties,' with nothing 'left open for future negotiation and agreement.'"[25]  The July 2004 PowerPoint presentation utterly fails to meet this test.  For example, it contains no effective date, and during her deposition Ms. Dodge could not even be certain whether the new commission schedule described on page six of this PowerPoint took effect in July or August 2004.[26]  Furthermore, it contains no statement as to specifically how commissions are calculated, nor does it say anything about when commissions are paid.

Ms. Dodge's argument also fails under the weight of its own internal inconsistency.  On the one hand, she argues on page ten of her Opposition that the PowerPoint presentation is the basis of her alleged written contract, yet she inscrutably states on page six of her Opposition that the terms of her purported contract "were reasonably certain having been derived from

---

[24] *See* Exhibit 4 to Roche Dec., at 2 (Docket No. 25-2) (emphasis added).
[25] *See* Ms. Dodge's Opposition to Defendant's Motion for Summary Judgment, at 12 (Docket No. 33) (citing *Newport News Hampton & Old Point Dev. Co. v. Newport News Street Ry. Co.*, 97 Va. 19, 21, 32 S.E. 789, 790 (1899).
[26] *See* Dodge Depo. at 29:21 – 30:10 (attached as Exhibit 2 to Roche Dec.) (Docket No. 25-2).

previously stated commission policies, and the documentation addressed at the meeting." Hence, Ms. Dodge makes the argument that the terms of "previously stated commission policies," which explicitly disclaim the formation of a contract, were suddenly transformed into binding contractual terms by summary PowerPoint slides displayed in a group meeting that were not even distributed to CDW-G's account managers. Ms. Dodge cites no authority for this bizarre proposition, because there is none. Under these circumstances, CDW-G respectfully submits that as a matter of law the July 2004 PowerPoint cannot form the basis of an enforceable contract. *Cole v. Champion Enterprises, Inc.*, 305 Fed. Appx. 122, 128-29 (4th Cir. 2008) (unpublished) (affirming district court's grant of summary judgment to employer and rejecting employee's argument that a PowerPoint presentation constituted an enforceable contract where "[t]he PowerPoint slides approved by the Board did not contain all material terms of the potential agreement.").

## C.     Both Counts of Ms. Dodge's Complaint Are Untimely Under Virginia's Three-Year Statute of Limitations for Unwritten Contracts

Ms. Dodge argues that the July 2004 PowerPoint presentation constitutes a written contract and therefore both of her claims qualify for the five year statute of limitations afforded such contracts. However, if the Court must look to external evidence in order to determine exactly what a contract entails, it falls under Virginia's three-year statute of limitations for unwritten contracts. *Marley Mouldings, Inc. v. Suyat,* 970 F. Supp. 496, 500 (W.D. Va. 1997). As described above, the PowerPoint presentation does not contain all the material terms of the purported contract and therefore requires the Court to look to external evidence to determine what the alleged contract entails. Ms. Dodge admits as much when she states on page six of her Opposition that the terms of her alleged contract "were reasonably certain having been derived from previously stated commission policies, and the documentation addressed at the [July 2004]

meeting." And of course, to the extent these unidentified "previously stated commission policies" consist of the documents identified in paragraphs 53-59 of CDW-G's SUMF, they cannot establish the existence of a written contract because they each disclaim the formation of a contract. Furthermore, Ms. Dodge already has admitted that her breach of contract claims involve, at least in part, "a <u>verbal</u> employment agreement...."[27] Unfortunately, following a familiar pattern, Ms. Dodge now tries to back away from this admission by stating in footnote four of her Opposition that "the known facts of this case have developed" since she filed her Complaint in May 2008 and her Opposition to CDW-G's Motion to Dismiss in May 2009. This is simply not the case. In fact, the "writing" (i.e., the July 2004 PowerPoint) upon which Ms. Dodge now bases her argument for applying the five-year statute of limitations was given to her sometime before May 2005 during her discussions with CDW-G's human resources department about her compensation on the Monitor Order; Ms. Dodge in fact produced a copy to CDW-G during discovery.[28] Accordingly, no facts "have developed" since May 2008 (or May 2009 for that matter) to make Ms. Dodge suddenly realize that the PowerPoint presentation is the singular document that supports her alleged written contract. Indeed, if the PowerPoint is truly the document that Ms. Dodge relies on to support her claims, one is left to wonder why she has previously represented to the Court that this case involves a "verbal employment agreement [that] is supplemented and altered by various written commitments and requirements of the employer, a number of which form the basis in part for Ms. Dodge's claim...but not the entire breached portions of Ms. Dodge's employment agreement...."[29]

---

[27] *See* Ms. Dodge's Memorandum in Opposition to Defendant's Motion to Dismiss, at 1-2 (Docket No. 6, May 26, 2009) (emphasis added).
[28] *See* Dodge Depo. at 25:12 – 26:22 (attached as Exhibit 1 to Supplemental Declaration of John K. Roche); *see also* Exhibit 12 to Dodge Depo. (attached as Exhibit 2 to Supplemental Declaration of John K. Roche).
[29] *See* Ms. Dodge's Memorandum in Opposition to Defendant's Motion to Dismiss, at 1-2 (Docket No. 6, May 26, 2009) (emphasis added).

Ms. Dodge should not be permitted to back away from these prior statements now that they prove inconvenient. *U.S. v. 198.73 Acres of Land, more or less, in Loudoun County, Va.*, 800 F.2d 434, 436 (4th Cir. 1986) ("Litigants are barred from taking inconsistent positions in order to protect the integrity of the courts and the judicial process.") (internal quotations omitted). In fact, the only new development since May 2009 is that Ms. Dodge now realizes it hurt her case to admit in court filings that she had a verbal employment agreement and to admit in her deposition that her breach of contract claim is based on documents that specifically disclaim the formation of a contract. Hence, Ms. Dodge now unconvincingly hitches her wagon to a single PowerPoint she has possessed for over four years in the vain hope that it qualifies as a written contract for purposes of Virginia's five-year statute of limitations.

Ms. Dodge does not attempt to argue that Count I of her Complaint (the Blackberry Order) can survive under Virginia's three-year statute of limitations,[30] but she does argue that Count II (the Monitor Order) is saved by the general rule that a plaintiff can elect to bring suit either (1) at the time they are notified the defendant will not perform, or (2) when the defendant's time for performance has come and gone. The foundational case in Virginia for this rule is *Simpson v. Scott*, cited at pages 15-17 of Ms. Dodge's Opposition. 189 Va. 392 (1949). However, as the Court noted in *Simpson,* there is an exception to this general rule:

> If there was an anticipatory breach, then the plaintiff had an election to wait until [defendant]'s death to bring her suit. <u>She would lose this right of election and the statute would begin to run at the earlier date</u> only if the repudiation was total and recognized and accepted by the plaintiff as a final breach and complete abandonment of performance.
>
> *Id.* at 400 (emphasis added).

---

[30] *See* Ms. Dodge's Opposition to Defendant's Motion for Summary Judgment, at 15 (Docket No. 33).

As Ms. Dodge testified in her deposition, as of April 12, 2005, she knew that (1) CDW-G was not going to pay her 19% commission on the Monitor Order; (2) CDW-G had completely and totally abandoned its alleged obligation to pay her a 19% commission on the Monitor Order; and (3) she "was not going to be able to work with CDW to pay [her] properly."[31] Accordingly, her claim under the Monitor Order accrued at the latest on April 12, 2005, and was therefore untimely when it was filed over three years later on May 16, 2008.

On page 17 of her Opposition Ms. Dodge attempts to distinguish this case from *Valentine v. Norfolk Southern Corp.*, 73 Va. Cir. 354, 2007 WL 6013574 (Va. Cir. Ct. June 4, 2007) by stating the injury the plaintiff suffered in that case was "the loss of her job offer, not her loss of unemployment benefits." This argument only proves CDW-G's point: Ms. Dodge was similarly injured on April 12, 2005 when she finally realized that CDW-G was unquestionably rescinding its alleged unilateral offer of 19% commissions, and her claim therefore accrued on that date. *Id.* at *2 ("Because all elements of a cause of action for breach of contract were present [when the employer rescinded its job offer], the Court finds, pursuant to Virginia Code § 8.01-230, that Valentine's cause of action accrued on that day.").

**D.     Even if the Court Finds CDW-G May Have Extended an Enforceable Unilateral Offer, CDW-G is Entitled to Summary Judgment on Both Counts of Ms. Dodge's Complaint Under the Terms of its Alleged Offer**

Contrary to the argument presented on pages 18-21 of her Opposition, Ms. Dodge's right to commissions did not "vest" on September 30, 2004, when CDW-G first received the Purchase Orders for the Blackberry and Monitor Orders. Rather, under CDW-G's longstanding policies, an account manager's right to commission vests ████████████████████████████████

---

[31] *See* CDW-G's SUMF, ¶ 42 (citing Dodge Depo. at 75:19 – 76:19) (Docket No. 25).

█████████████[32] Therefore, the date of September 30, 2004 is wholly irrelevant to determining when Ms. Dodge earned any commissions on the orders at issue. In making her argument that she had a vested right to commissions on September 30, 2004, Ms. Dodge completely ignores the *Jensen* case and instead engages in an irrelevant discussion of "vested rights" under land use law. Ms. Dodge has chosen not to grapple with *Jensen* because in that case the Fourth Circuit stated that in the absence of "<u>vesting</u> language, a commission might be <u>earned</u> when the sale is made." 454 F.3d at 389 (emphasis added). Hence, in its analysis of Virginia contract law applicable to a unilateral offer of commissions – not land use law – the Fourth Circuit used the phrase "vesting language" to describe when commissions are "earned." In the *Jensen* case, IBM's "vesting language" stated that "[n]o one becomes entitled to any payment in advance of his or her receipt of the payment," and based on this language, the Fourth Circuit found that the plaintiff's right to commissions "d[id] not vest until commissions are paid." *Id.* at 388-89. In this case, CDW-G actually used the word "earned" in its "vesting language" and made clear that the right to commissions does not "vest" until ████████████████



In response to paragraph 8 of CDW-G's SUMF, Ms. Dodge tries to argue that this language does not apply to her claims, but that argument is unconvincing for the reasons stated above.

---

[32] As explained in CDW-G's Opposition to Ms. Dodge's Motion for Summary Judgment, it would be ludicrous for CDW-G to obligate itself to pay commissions to account managers based upon CDW-G's receipt of a Purchase Order, as Purchase Orders are often modified or cancelled, which directly impacts the revenue and gross profit that CDW-G earns, if any. *See* Opposition to Plaintiff's Motion for Summary Judgment, at 9-10 (Docket No. 34).

[33] *See* Exhibit 4 to Dodge Depo, at 4 (Exhibit 4 to the Roche Dec.) (emphasis added); *see also* CDW-G's SUMF, at ¶ 8 (Docket No. 25).

Furthermore, CDW-G also clearly retained the right to modify its policies:

> **[a]s with all CDW policies, the policies and procedures described in this handbook are subject to change at any time, with or without notice.** The contents of this handbook are presented as a matter of information only and **do not create a contract**. None of the policies, procedures or benefits described in this or any other handbook are intended by reason of their publication to confer any rights or privileges upon you, or entitle you to be or remain employed by CDW for any particular length of time or **at any level of compensation or benefits**.[34]

Whether Ms. Dodge never read this language or simply chose to ignore it, she is still bound by this language if the Court chooses to construe CDW-G's policy as a binding offer. *Jensen*, 454 F.3d at 390 ("If we were to take any plan as an offer, as [plaintiff] urges us to do, he would nonetheless be bound by its full terms and could not select only the terms that he elected to read."). Accordingly, Ms. Dodge's right to commissions did not vest on September 30, 2004, and CDW-G was within its rights to notify her of any alleged change in commissions up until the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *Id.* at 389 ("IBM would have been within its rights under [plaintiff]'s purported contract to introduce the 200% Rule…for the first time <u>after he closed the IBM deal</u>.") (emphasis added).

### 1.   Count I (the Blackberry Order)

As stated in CDW-G's Motion for Summary Judgment, in November 2004, Ms. Dodge's supervisors reduced her share of the adjusted gross profit by $60,000.00 for the Blackberry Order and credited that amount to the sales total for a sales specialist in another department who did 60% of the work on the Blackberry Order up to September 30, 2004, and no less than 30% of the work after that date.[35] If Ms. Dodge is unable to "set out specific facts showing a genuine issue for trial" on the lawfulness of CDW-G's exercise of its discretion on this issue, then summary

---

[34] *See* Exhibit 4 to Dodge Depo, at 2 (Exhibit 4 to the Roche Dec.) (emphasis added).
[35] *See* CDW-G's SUMF, ¶ 30 (Docket No. 25).

judgment should be entered in CDW-G's favor on Count I of the Complaint. *See* Fed. R. Civ. P. 56(e)(2); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). As described above, Ms. Dodge has raised some issues of fact with regard to paragraph 11 of CDW-G's SUMF, which addresses CDW-G's policy of occasionally splitting gross profit with other sales coworkers. However, as also described above, Ms. Dodge's affidavit in support of her Opposition is rife with testimony that completely contradicts her deposition, and the affidavit should therefore be disregarded by the Court altogether. *Rohrbough*, 916 F.2d at 975. Without the affidavit, Ms. Dodge is left with nothing to support her dispute as to paragraph 11 of CDW-G's SUMF. Thus, without the affidavit, Ms. Dodge has failed to carry her burden of explaining how CDW-G's actions were in any way unlawful when it exercised the discretion it retained over the calculation of the gross profit on the Blackberry Order by allocating a portion of that profit to another employee who performed a substantial amount of work in securing the sale. *Jensen*, 454 F.3d at 389 (finding that IBM's calculation of the gross profit was proper where plaintiff offered no rebuttal to IBM's calculation).

### 2.     Count II (the Monitor Order)

Ms. Dodge does not contest paragraphs 12 through 15 of CDW-G's SUMF, which reflect her <u>stipulation</u> that commissions are calculated based on the month in which the goods are shipped and invoiced – not when a Purchase Order is signed – and that commissions are then paid in the month *after* they are *earned* (e.g., commissions earned in May are paid in June). Nor does she contest paragraphs 45, 47 and 49 of CDW-G's SUMF, which demonstrate she was paid on the Monitor Order in May, June and July 2005. Ms. Dodge, however, does contest paragraphs 38 and 39 of CDW-G's SUMF, which demonstrate that as of March 28, 2005, she was informed that the Megadeal policy was in effect at CDW-G and that the company was

applying the Megadeal 10% commission policy to the Monitor Order. Yet, as described above, her efforts to contradict her own deposition testimony and other evidence in support of her denials of paragraphs 38 and 39 are not allowed. Finally, Ms. Dodge does not contest paragraph 43 of CDW-G's SUMF, which demonstrates that shipping and invoicing under the Monitor Order began no sooner than three weeks after March 28, 2005, on April 21, 2005. Thus, the undisputed evidence is that Ms. Dodge knew of the existence and application of the Megadeal policy to the Monitor Order before she had earned any commissions for the Monitor Order. Even if one accepts for purposes of summary judgment that the Megadeal policy had not been effectively communicated to Ms. Dodge as of September 30, 2004, this is irrelevant in light of the fact that the policy was unambiguously communicated to her as of March 28, 2005, well before she earned any right to commissions.

## II.  CONCLUSION

For the reasons stated here and in CDW-G's Motion for Summary Judgment, CDW-G respectfully requests that the Court enter summary judgment in its favor and against Ms. Dodge on both counts of the Complaint.

DATED this 20th day of November, 2009.

Respectfully submitted,

By_____/s/_____
    John K. Roche (VSB# 68594)
    Perkins Coie, LLP
    607 Fourteenth Street N.W., Suite 800
    Washington D.C.  20005-2003
    Phone: 202-434-1627
    Fax:  202-654-9106
    JRoche@perkinscoie.com

Attorney for CDW Government, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November, 2009, I will electronically file the foregoing with the Clerk of Court using the Court's CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Paul A. Prados
Cuccinelli & Day, PLLC
10560 Main St., Ste. 218
Fairfax, VA  22030
703-268-5600
703-268-5602 (facsimile)
pprados@cuccinelliday.com
Attorney for Plaintiff April M. Dodge

By_____/s/_____
   John K. Roche (VSB# 68594)
   Perkins Coie, LLP
   607 Fourteenth Street N.W., Suite 800
   Washington D.C.  20005-2003
   Phone:  202-434-1627
   Fax:  202-654-9106
   JRoche@perkinscoie.com

   Attorney for CDW Government, Inc.