IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| APRIL M. DODGE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:09cv528 (AJT/IDD) |
| ) | |
| CDW GOVERNMENT, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM OPINION

The Plaintiff, April M. Dodge, has sued Defendant CDW Government, Inc. ("CDW-G") to recover unpaid commissions with respect to two purchase orders she procured for CDW-G while an employee of CDW-G. The Court tried this case without a jury on January 12, 2010; and now issues its verdict in favor of the plaintiff and awards the sum of $76,689, together with pre-judgment interest at the rate of 6% per annum from August 1, 2005 until the date of judgment. Pursuant to Fed. R. Civ. P. 52(a)(1), this Court issues the following findings of fact and conclusions of law.

### I. Findings of Fact[1]

On or about February 23, 2003, Ms. Dodge began working for CDW-G as an at-will employee. She worked as an account manager in the sales department of CDW-G in CDW-G's state, local, and education division from February 2003 until May 2004, at which time she transferred to CDW-G's federal division, where she worked as an account manager until her voluntary resignation in February 2009.

---

[1] The Court makes additional findings of fact, as set forth in Part II, Conclusions of Law.

Ms. Dodge's responsibilities as an account manager included arranging to fulfill the needs of the federal government for technology products for which she was compensated with a base salary plus commission. Under the compensation arrangement in effect at CDW-G for account managers, monthly sales targets are provided at the beginning of the month, and the amount of commissions are based on whether an account manager meets or exceeds the monthly sales target. An account is credited with the sale when an invoice is generated and shipped along with the goods to the customer, and the commission is paid to the account manager who is credited with the account in the month following the month in which the account is credited. For example, if goods are shipped in May, commissions are earned in May and are paid in June. Commissions are calculated based on the sales target for the month in which the goods were shipped and not when the purchase order is signed. For someone with Ms. Dodge's experience with the company, the maximum commission rate was 19% of a purchase order's "adjusted gross profit," as calculated by CDW-G.

On or about September 30, 2004, Ms. Dodge secured two purchase orders from the Defense Contract Management Agency ("DCMA"), one in the amount of $1.6 million for BlackBerry devices (the "BlackBerry Agreement") and one in the amount of $2.56 million for computer monitors (the 'Monitor Agreement"). The Monitor Agreement was increased by an additional $80,000.00 due to changes in the particular model of the monitors purchased. At all relevant times, DCMA was considered Ms. Dodge's customer.

The purchased BlackBerry devices were shipped and invoiced on November 24, 2004; and in December 2004, CDW-G paid to Ms. Dodge her commission for the BlackBerry Agreement. The adjusted gross profit on the Blackberry Agreement, as calculated by CDW-G, was $203,486. However, for the purposes of calculating Ms. Dodge's commission, CDW-G

reduced that adjusted gross profit by $60,000 in order to reflect what Ms. Dodge's supervisors considered to be the contribution of a "sales specialist" in another department in procuring the BlackBerry Agreement. She therefore received a commission of $27,262 with respect to the Blackberry Agreement based on a 19% commission applied against an adjusted gross profit of $143,486. Had her commission been calculated based on an adjusted gross profit of $203,486, she would have received an additional $11,400.

On or about December 13, 2004, Robert Rossi, one of Ms. Dodge's overall supervisors, informed Ms. Dodge that CDW-G's "mega deal policy" applied to sales in excess of $2.5 million and that under that mega deal policy commissions are limited to 10% of the adjusted gross profit. No later than March 28, 2005, Mr. Rossi told Ms. Dodge that CDW-G intended to apply the mega deal policy to limit her commission to 10% of the adjusted gross profit on the Monitor Agreement. The monitors purchased under the Monitor Agreement began to be shipped and invoiced no sooner than April 21, 2005 and Ms. Dodge was paid commissions with respect to the Monitor Agreement in May, June, and July 2005. In that regard, CDW-G paid Ms. Dodge with respect to the Monitor Agreement (1) $20,403 on May 20, 2005 for commissions based on April 2005 invoiced sales; (2) $42,049 in June 2005 based on May 2005 invoiced sales; and (3) $19,275 in July 2005 based on June 2005 invoiced sales. As a result, she received a total of $81,727 in commissions on the Monitor Agreement based on a 10% commission. Had a 19% commission been paid with respect to the Monitor Agreement, she would have received an additional $19,178 in May 2005; $38,733 in June 2005; and $18,778 in July 2005, for an additional total amount of $76,689.

### A. Documents evidencing the contractual relationship between the parties

CDW-G contends that it distributed to Ms. Dodge certain documents in connection with her employment that defined, limited and qualified her claim to commissions and that her claim to additional commissions in this case is inconsistent with the disclaimers and qualifications set forth in those documents. Those documents include the following:

(1) At the time she was hired in 2003, Ms. Dodge received a document entitled "Welcome to the CDW-G Account Management Team," which she signed and dated February 28, 2003. Defendant Exhibit 11. Specifically, this document described the bi-weekly salary that account managers received as well as the commission structure and how compensation would change over time. For example, the document said:



*Id.* The document went on to advise that "Full details of all CDW information will be explained in "CDW Sales Guidelines and Procedures." *Id.* The document further advised that:

> This document does not constitute or represent any contractual commitments between CDW and its employees; nor does it in any way modify the current "at-will" employment relationship between CDW and employees. It is the policy of CDW, in accordance with Illinois law, that you are free to terminate your employment at any time and for any reason. CDW reserves the same right.

*Id.*

(2) At the time she was hired, Ms. Dodge also received a document entitled "CDW Computer Centers, Inc. 2003 CDW Sales Guidelines and Procedures." This document, which refers to itself as a "handbook," provided general information with respect to compensation,

4

training and scheduling, account manager policies and procedures, and a confidentiality agreement. Defendant Exhibit 12. The document stated in part:

> This handbook is furnished to you for the purposes of describing some of the policies and procedures that apply to CDW account managers. Other policies and procedures that may apply to account managers are contained in a manual entitled "Road to Success" as well as other documents which may be disseminated by the company from time to time. If there is any conflict between the polices and procedures described in this handbook and the policies in any other CDW manual, the policies in this handbook will usually apply, but the company reserves the right to have the final say on whether there is a conflict and which policy will apply.

*Id.* at 2. The document continued:

> As with all CDW policies, the policies and procedures described in this handbook are subject to change at any time, with or without notice. The contents of this handbook are presented as a matter of information only and do not create a contract. None of the policies, procedures or benefits described in this or any other handbook are intended by reason of their publication to confirm any rights or privileges upon you, or entitle you to be or remain employed by CDW for any particular length of time or at any level of compensation or benefits. Employment at CDW is strictly "at-will," which means that you or the company are free to end the employment relationship at any time and for any reason. No CDW employee other than the President of the Company is authorized to make any representations, promises or agreements concerning any employees term of employment, compensation or benefits and, to be enforceable, any such representation, promise or agreement must be in writing and signed by the President.

*Id.*

The document went on to describe how compensation is calculated:





*Id.* at 4. With respect to the specific compensation, the document continued:



*Id.*

(3) On January 8, 2004, Ms. Dodge signed a document titled "CDW Corporation Road to Success Acknowledgement." This document states:

> I ... understand that the information in this booklet is subject to change as situations warrant and I understand that changes in the policies may supersede, modify, or eliminate the policies in this booklet .... *I also understand the "Road to Success" in no way alters my 'at-will' employment with CDW—I am free to terminate my employment at any time, with or without cause and with or without notice, and CDW reserves the same right.*

Defendant's Exhibit 24 (emphasis in original).

### B. The July, 2004 Commission Presentation

In July 2004, Ms. Dodge participated in a meeting for account managers presented by Max Petersen, CDW-G's Senior Vice President of Sales, concerning an updated sales plan (the "July 2004 Presentation"). Defendant's Exhibit 13. The July 2004 Presentation was described as "2004 Sales Plan Updates." *Id.* at 2. The purpose of the meeting was to present a less complicated commission matrix in order to better reward and motivate CDW-G's account managers. As reflected in the PowerPoint slides in evidence pertaining to the July 2004

6

Presentation, Ms. Dodge and others attending the meeting were told that from the company's perspective they would be more motivated if they better understood how they can "make more money" since it was "too hard to understand how your sales performance tied to you commissions." *Id.* at 4-5. Presented was a "new federal matrix," which set forth specific commissions tied to specific gross profit goals. *Id.* at 6. Under the new federal matrix, a 19% commission was assigned for any sales whose gross profit was in excess of ▇▇▇▇▇▇▇▇ of an account manager's monthly gross profit goal. There was no indication in the PowerPoint slides and there were no oral statements by the company at the July 2004 Presentation that the federal matrix was in any way qualified or subject to revision up until the time that the described commissions were paid; nor did the presentation reference or incorporate any other documents. In other words, CDW-G did not expressly qualify or condition the new commission matrix and did not indicate that it retained the right to award commissions other than what was set forth in the federal matrix after the account managers closed sales. With respect to the mega deal policy later applied to Ms. Dodge, the only mention in the PowerPoint slides was under the section "Future" and the outline noted that there would be a sales plan document distributed at the end of July 2004 that would "address mega deal compensation rules." *Id.* at 9. No such plan, however, was ever distributed at the end of July, 2004 or at any time before Ms. Dodge closed the Blackberry Agreement and the Monitor Agreement on September 30, 2004. Following the July 2004 Presentation, she and other account managers received a copy of the new federal matrix. It is undisputed that based on the July 2004 federal matrix, Ms. Doge's commission on the Blackberry and Monitors Agreements was 19% of adjusted gross profit.

Ms. Dodge contends she was entitled to be paid commissions based on the federal matrix that was presented at the July 2004 Presentation. CGW-G contends based on the documents

distributed to or signed by Ms. Dodge in connection with her employment, CDW-G had the right to determine in its sole discretion what commissions to pay with respect to those agreements and for that reason, was permitted to (1) reduce the adjusted gross profit in calculating the 19% commission on the Blackberry Agreement; and (2) use a 10% commission on the Monitor Agreement pursuant to its mega deal policy. CDW-G also contends that Ms. Dodge's claims are barred by the three year statute of limitations applicable under Virginia law to claims based on oral contracts.

## II. Conclusions of Law

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and Virginia substantive law governs plaintiff's breach of contract claims.

### A. Whether CDW-G made an enforceable contractual offer

The Court must first determine whether Ms. Dodge has proved her entitlement to the commissions claimed. In this regard, she contends that the July 2004 Presentation was a unilateral contract offer, which she accepted through performance and that once she procured the DCMA purchase orders on September 30, 2004, she had a binding contractual right to be compensated as set forth in the federal matrix presented at the July 2004 Presentation. CDW-G counters that there could be no such contract consummated through performance because the language in the company's documents distributed to Ms. Dodge when she was hired qualified anything said in the July 2004 Presentation and for that reason nothing said or presented could be deemed a unilateral offer that could cause a contract to be formed through performance.

Virginia law has long recognized that employers can make unilateral contract offers to at-will employees, independent of the at-will employment contract, as long as its terms are

8

reasonably sufficient. *Hercules Powder Co. v. Brookfield*, 189 Va. 531, 541, 53 S.E.2d 804, 808 (Va. 1949) ("Ample authority sustains the view that such a promise amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements of a contract."); *see also Jensen v. IBM Corp.*, 454 F.3d 382, 387 (4th Cir. 2006) ("Employers can make unilateral offers even to at-will employees, whose employment is otherwise without a contract.").

The July 2004 Presentation set out the new commission structure for account managers without qualification. It was clearly intended to be an invitation and inducement to obtain purchase orders for the company. In fact, the purpose of the July 2004 Presentation, as represented by CDW-G in the Power Point presentation, was to "motivate" the account managers in order to allow them to "make more money." Defendant's Exhibit 13 at 4. To promote those purposes, CDW-G declared its intention to make it clear what commissions account managers would receive based on their sales, since under the prior commission structure, it was "too hard to understand how your sales performance tied to your commissions." *Id.* at 5. The Court finds and concludes that the July 2004 Presentation functioned as a unilateral contract offer, which could be accepted by the account managers through performance (i.e. making a sale).

The Court must next determine whether any language in the documents Ms. Dodge had already received qualified or conditioned the otherwise unqualified nature of the July 2004 Presentation, such that the July 2004 Presentation could not be reasonably understood as a unilateral offer and CDW-G could apply a different commission structure to sales made following the July 2004 Presentation. In this regard, the issue is whether the language used by CDW-G in those documents negated, altered or qualified the contractual consequences that Ms. Dodge's performance would otherwise have.

9

Here, CDW-G did effectively communicate to Ms. Dodge that the handbook itself did not create a contract and that nothing short of a document signed by its president could ever create anything other than an at-will relationship. It also effectively disclaimed that any future pronouncements in and of themselves would create anything other than an at-will relationship. However, the language used by CWD-G did not insulate CDW-G from the contractual consequences otherwise resulting from plaintiff's performance in response to the unqualified federal matrix that was presented to her in July 2004 Presentation. Neither in the handbook, the July 2004 Presentation nor in any other document did CDW-G reserve to itself the broad unfettered discretion that it now claims. In that regard, nothing in the language CDW-G used either before, during or after the July 2004 Presentation and before September 30, 2004, when the DCMA purchase orders were obtained, would have reasonably caused an account manager to think that once it had obtained a purchase order, CDW-G could retroactively impose a less favorable commission structure in whatever way it wanted, including no commissions at all. If such an arrangement was indeed CDW-G's intention, it had the obligation to state so in clear, unambiguous language. CDW-G failed to do so. One of the documents[2] given to Mis Dodge when she was hired refers to certain commissions as "guaranteed;" and the language used in presenting the new commission structure during the July 2004 Presentation was fundamentally inconsistent with the notion that CDW-G was committing itself to nothing should an account manager go out and actually make a sale.

As to the mega deal policy, CDW-G did not inform Ms. Dodge before she procured the DCMA purchase orders in September, 2004, or indeed before December 2004, that there was in fact a mega deal policy in place and in effect with respect to any sales that she would make. While CDW-G did state that it might formulate and distribute a mega deal policy, it never did so

---

[2] The 2003 CDW Sales Guidelines and Procedures, Defendant's Exhibit 12 at 4.

before the DCMA contracts were procured. Although CDW-G reserved the right to change any of its policies without notice, that reservation in and of itself did not preclude the formation of a contract based on the July 2004 Presentation, and subsequent performance, before any such change. In addition, there is nothing inconsistent with Ms. Dodge's at-will employment relationship and her entitlement to commissions based on actually procured purchase orders. For these reasons, the Court concludes that Ms. Dodge was entitled to receive commissions on the BlackBerry and Monitor Agreements according to the federal matrix that was presented in the July 2004 Presentation and that under that matrix she was entitled to receive a commission of 19% of the adjusted gross profit on those purchase orders.

CDW-G relies heavily on *Jensen v. IBM*, 454 F.3d 382 (4th Cir. 2006) and *Michael v. Sentara Health System*, 939 F. Supp 1220 (E.D. Va. 1996). In *Jensen*, IBM had a written policy in place that specifically reserved the right to change the commission rate anytime up until the time that the commission was paid.[3] In *Michael*, the language used by the hospital in its handbook made clear that nothing would create anything other than an at-will employment arrangement. *Id.* at 1235. The issue in this case is not whether CDW-G sufficiently reserved to itself the right to change its policies in the future, or whether it sufficiently advised the employee that nothing would create anything other than an at-will employment relationship. Instead, the issue is whether CDW-G adequately declared that even after a sale was made, an account

---

[3] The language used by *Jensen* specifically and explicitly stated commissions could be changed without notice up until the moment of payment:

> Right to Modify or Cancel: While IBM's intent is to pay employees covered by this program according to its provisions, this program does not constitute a promise by IBM to make any distributions under it. IBM reserves the right to adjust the program terms or to cancel or otherwise modify the program at any time during the program period, or up until actual payment has been made under the program. Modification or cancellation may be applicable to all persons covered by the program, or to any subset as defined by management. Even though you may be given progress reports regarding plan achievement during the year, no one becomes entitled to any payment in advance of his or her receipt of the payment.

*Jensen*, 454 F.3d at 385.

manager still had no right to commissions under the commission structure that CDW-G said applied to those purchase orders. Nothing that CDW-G said negated the effects that Ms. Dodge's performance otherwise had. The Court concludes that CDW-G breached its contractual obligation to pay to Ms. Dodge a commission on the BlackBerry and Monitor Agreements at the rate of 19% of adjusted gross profit.

## B. Statute of Limitations

CDW-G has asserted a statute of limitations defense under Va. Code § 8.01-246.[4] In this regard, CDW-G contends that plaintiff's claim to commissions at the rate of 19% is based on an alleged oral contract, not a written contract. Since she was paid in December 2004 on the Blackberry Agreement and did not file suit until May 16, 2008, CDG-W contends that her claim for unpaid commissions on the BlackBerry Agreement is barred by the three year statute of limitations applicable to oral contracts. Likewise, CDW-G contends that plaintiff was told no later than April 2004 that she would not receive a 19% commission on the Monitor Agreement and that her claim for unpaid commissions on the Monitor Agreement is likewise barred. Ms. Dodge contends, on the other hand, that the federal matrix that was presented at the July 2004 Presentation, and subsequently distributed in hard written copy, constitutes a written contract for the purposes of the statute of limitations and that her claims are therefore subject to a five year limitations period.

---

[4] Va. Code, § 8.01-246 provides :

> [A]ctions founded upon a contract, other than actions on a judgment or decree, shall be brought within the following number of years next after the cause of action shall have accrued:
> 1. ...
> 2. In actions on any contract which is not otherwise specified and which is in writing and signed by the party to be charged thereby, or by his agent, within five years whether such writing be under seal or not;
> 3. ...
> 4. In actions upon any unwritten contract, express or implied, within three years.

12

The Court concludes that Ms. Dodge's entitlement to a 19% commission is based on an oral contract. Under Virginia law, which governs this issue, a "written contract" for limitations purpose is a writing that contains all the terms and conditions necessary to enforce the contract. While a "written contract" need not necessarily be signed, a written document must embody all the terms and conditions of the contract. *Newport News, H. & O. P. Development Co. v. Newport N. S. R. Co.*, 32 S.E. 789, 790 (Va. 1899) ("[A] written agreement ... must ... show on its face a complete and concluded agreement between the parties. Nothing must be left open for future negotiation and agreement, otherwise it cannot be enforced."); *See also Corinthian Mortg. Corp v. ChoicePoint Precision Mktg.*, LLC, 2008 U.S. Dist. LEXIS 53573 (E.D. Va. 2008) (re-iterating the test put forth in *Newport News*). Here, there is no signed contract by Ms. Dodge and CDW-G concerning her commissions and there is no written document that sets forth all of the terms and conditions that pertain to plaintiff's entitlement to a commission, including when they are payable and the meaning of certain terms used in the federal matrix. In order to understand the parties' rights and obligations under the federal matrix, as well as what the commission structure means and how it is to be applied, one needs to rely on agreements and understandings other than those set forth in the written federal matrix. For this reason, the Court concludes that Ms. Dodge's right to commissions is based on an oral contract, not a written contract, and that her claim for unpaid commissions with respect to the BlackBerry Agreement is barred by the three year statute of limitations.

With respect to her claim for unpaid commissions on the Monitor Agreement, the Court finds that she timely filed her claim. Ms. Dodge contends that her claim was timely since CDW-G did not breach its obligation to pay a 19% commission until, at the earliest, May 20, 2005 when it first started paying commissions on the Monitor Agreement, and she filed her suit on

May 16, 2008, a date within the three year statute of limitations. CDW-G, on the other hand, claims that it had effectively and unconditionally disclaimed any intention to pay a 19% commission before May 2005. In this connection, it points to e-mails telling Ms Dodge was she would not be compensated on the basis of a 19% commission. In response, Ms. Dodge states that the mega deal policy had been the subject of extensive, ongoing discussions and that she did not know to a certainty whether it would be applied to the Monitor Agreement until CDW-G actually paid her a commission on that sale.

Under Virginia law, a statute of limitations may begin to run where an obligation has been so totally repudiated that a plaintiff knows to a certainty that the obligations has been breached. Otherwise, it begins to run on the expected date of performance. *See High Knob Assocs. v. Douglas*, 249 Va. 478, 486-87 (1995) ("The statute of limitations runs from the time of actual performance and not the time of the anticipatory repudiation."); *Simpson v. Scott*, 189 Va. 392, 400 (1949) ("In order to permit the immediate institution of a suit, the repudiation of a contract must cover the entire performance to which the contract binds the promisor and the renunciation must be absolute and unequivocal."). Here, the Court finds that while Ms. Dodge was told that it was CDW-G's intention to apply the mega deal policy to the Monitor Agreement and a 10% commission rate pursuant to that policy, she did not have the absolute and unequivocal certainty of non-payment required to begin the running of the statute of limitations until she in fact failed to receive a 19% commission with respect to the Monitor Agreement. She did not receive any commissions on the Monitor Agreement until May 20, 2005, and CDW-G did not breach any contractual obligation to pay commissions on the Monitor Agreement until May 20, 2005, at the earliest. In addition, CDW-G continued to pay commissions on the Monitor Agreement through July 2005. Throughout this period, Ms. Dodge continued to be a CDW-G

employee and the company had taken different positions at different times on whether and how to apply the mega deal policy. For example, Ms. Dodge was originally told by her immediate supervisor on December 13, 2004, before she received her commissions on the BlackBerry Agreement, that the mega deal policy would apply to the BlackBerry Agreement and that she would receive only a 10% commission on that sale, only to have that decision rescinded by her overall supervisor who authorized a 19% commission on the BlackBerry Agreement. For all these reasons, and based upon all the evidence, and the reasonable inferences from that evidence, the Court finds that the statute of limitations with respect to her claim for unpaid commissions on the Monitor Agreement did not begin to run until May 20, 2005 and she timely filed her claim.

For the above reasons, the Court finds in favor of Plaintiff April M. Dodge in the amount of $76,689. This Court may also award prejudgment pursuant to Va. Code Ann. § 8.01-382. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. Va. 1999) ("Virginia law governs the award of prejudgment interest in a diversity case."); *Dairyland Ins. Co. v. Douthat*, 248 Va. 627 (Va. 1994) ("[Va. Code § 8.01-382] provides for the discretionary award of prejudgment interest by the trier of fact, who 'may provide for' such interest and fix the time of its commencement."). In this case, the unpaid commissions are a sum certain, and prejudgment interest is necessary to fully compensate Ms. Dodge. The Court therefore concludes that an award of prejudgment interest is appropriate at the specified rate of 6% per annum,[5] assessed as of August 1, 2005, the date by which the full amount of commissions on the Monitor Agreement should have been paid. This prejudgment interest amounts to $20,699.73, for a total compensatory award of $97,388.73.

---

[5] *See.* Va. Code § 6.1-330.54.

An appropriate Order will issue.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
January 29, 2010